UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

GARRY KIRKLAND,                          :            **REPORT and RECOMMENDATION**

                 Plaintiff,            :            09 Civ. 10235 (RJH)(KNF)

           -against-            :

CABLEVISION SYSTEMS,            :

               Defendant.            :
------------------------------------------------------X

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

TO THE HONORABLE RICHARD J. HOLWELL, UNITED STATES DISTRICT JUDGE

## I.  INTRODUCTION

Garry Kirkland ("Kirkland"), proceeding pro se, brings this action against his former

employer Cablevision Systems New York City Corporation ("Cablevision"), identified in

Kirkland's amended complaint as "Cablevision Systems," pursuant to Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), Section 296(1) of the

New York Executive Law ("New York State Human Rights Law") and Section 8-107 of the

New York City Administrative Code ("New York City Human Rights Law").  Kirkland alleges

that Cablevision terminated his employment, based on his race and color, and retaliated against

him for complaining of unlawful discrimination.  Kirkland also contends that Cablevision

subjected him to a hostile work environment and unequal terms and conditions of employment.

Before the Court are the parties' respective motions for summary judgment, made

pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## II.  BACKGROUND

Kirkland, a black male, began working for Cablevision in 1999.  He alleges that beginning in 2004, and continuing to his termination in 2008, he was treated differently from white employees and, whenever he complained to his immediate supervisor or to the defendant's employee relations and human resources personnel about the disparity in treatment, he was subjected to retaliation, through unsatisfactory performance evaluations and, ultimately, the termination of his employment.

Kirkland contends that, in August 2004, Michael Kaplan ("Kaplan"), the managing director of the defendant's Bronx Call Center, the facility where Kirkland was then serving as Call Center manager, altered his Wednesday Call Center management team meetings, from 2:00 p.m. to 3:00 p.m., to accommodate a newly appointed white Call Center manager, who, like Kirkland, worked the 3:00 p.m. to midnight shift.  Kirkland complained to Kaplan then and, again, in November 2004, that his decision to change the meeting time to accommodate the white employee was discriminatory, because Kaplan had declined to make the same accommodation for Kirkland one year earlier.

In October 2004, Richard Belden ("Belden"), managing director of the defendant's Optimum Stores, and Frank Naples ("Naples"), vice president of the defendant's Billing & Collections Department, selected Kirkland to fill the position Area Operations Manager ("AOM") for Cablevision's Optimum Stores in the Connecticut-Westchester-New York City region ("CWN"), effective November 1, 2004.  CWN is the region with the most cash transactions and highest cash volume of the four regions in which Optimum Stores are located. In addition to CWN, the other regions are Northern New Jersey, Southern New Jersey and Long Island.  Each region has one AOM.  Kirkland's new position was a promotion for him.  Upon his

promotion, Kirkland reported directly to Belden, as did the other three AOMs: Sandy Wicklund ("Wicklund "), Kerry Burgin ("Burgin"), and Laura Cavazzi ("Cavazzi"), all of whom are white females.  Kirkland's starting salary as an AOM was $74,800, a 13% increase over his former salary of $66,200.  According to Kirkland, his starting salary was less than the salary paid to each of the other AOMs and, although he managed the largest region, he was always paid less than the other AOMs.

In his AOM capacity, Kirkland was responsible for overseeing the overall operations of all CWN Optimum Stores, managing the stores' staffs and implementing and ensuring compliance with Cablevision's policies and procedures.  Six store managers, all of whom were black, reported directly to Kirkland.  The store managers supervised the day-to-day operations of the stores and the employees: Team Leaders and Customer Relationship Coordinators ("CRC"),  assigned to their respective stores.

In January 2005, Kirkland was given his 2004 annual performance evaluation.  Kirkland received a rating of 2.6, which he contends is one-tenth of a point below the 2.7 rating he needed to satisfy the defendant's "Meet Requirements" performance standard.  Kirkland maintains that the unsatisfactory performance rating was given to him in retaliation for complaining to Kaplan about racial discrimination, because throughout the review period he was never informed his performance was not meeting requirements, and on several occasions, during the year, Kaplan had complimented his work.

Kirkland recalls that, in or around December 2005, following an employee theft of over $3,000, in cash, from an Optimum Store in northern New Jersey, he recommended to Belden that AOMs assume a more active role in the cash management activities at Optimum Stores, by auditing the cash on hand and maintained in stores' safes; however, his recommendation was not

adopted.  In the Spring of 2006, Kirkland and a Team Leader audited all the safes in CWN and reported their findings to Belden.  Once again, Kirkland recommended that AOMs be permitted to implement a formal audit process and Belden did not adopt the recommendation.

Kirkland contends he made other recommendations to improve efficiency and customer experiences at the Optimum Stores, but none of the recommendations was implemented. According to Kirkland, he asked one of the white female AOMs to submit a recognition proposal to the defendant that Kirkland had submitted previously for approval, unsuccessfully.  Kirkland contends that when his colleague submitted the proposal, it was adopted.

Kirkland alleges that he developed and implemented a customer service training program in CWN and presented the same training program in a store located in the defendant's Northern New Jersey region.  According to Kirkland, as a result of the training he provided, the New Jersey store exceeded its customer satisfaction rating goal for four consecutive months, and the Northern New Jersey region was designated "Region of the Year for 2007," beating CWN for that designation by .004 percentage points.  In or about December 2007, Kirkland maintains that he complained to Belden, in writing and orally, that the formula used to determine the Region of the Year designation was skewed to favor his white counterparts, as it failed to account for differences in the number of transactions occurring at the stores in the various regions.  Kirkland, contends CWN stores processed one million more transactions than the stores in the Northern New Jersey region.

In January 2008, when Kirkland was given his 2007 annual performance evaluation, he received an overall rating of 2.7, "Needs Improvement," and did not receive a raise in salary. Kirkland submitted a written rebuttal to his performance evaluation and according to Kirkland, he complained orally to Belden, Lynne Donnelly ("Donnelly"), the defendant's employee

-4-

relations manager, and Isaac Fennell ("Fennell"), Cablevision's director of administration, responsible for human resources, about his 2007 annual performance evaluation and the discrimination he experienced.  However, Kirkland contends he received no "feedback" from them; instead, in February 2008, Belden placed him on a Performance Improvement Plan ("PIP").  Kirkland alleges that since Belden had not advised him during the review period that he was not meeting expectations, the PIP, like the annual performance evaluation, was yet another act of retaliation directed at him for complaining about what he considered to be a biased formula for determining Region of the Year.  In July 2008, Kirkland interviewed, unsuccessfully, for the position Managing Director, Optimum Stores.  He contends that he did not advance beyond the first round of interviews for the position because of his 2007 annual performance evaluation.

In August 2008, Robert Cockerill ("Cockerill") replaced Belden as managing director of the Optimum Stores.  Kirkland recalls that, in his first meeting with Cockerill, after he became Kirkland's supervisor, he advised Cockerill that, under Belden, he had not been treated as the other AOMs had been treated.  Shortly after his appointment, Cockerill and Fennell met with the AOMs and administered a "Final Written Warning" to each of them, based upon the results of store audits that had been performed in April 2008.  Cockerill explained to Kirkland that the store managers would also be administered Final Warnings and that either he or Fennell would accompany Kirkland when Kirkland administered the Final Warnings to the CWN store managers.  Kirkland recalls that he asked Cockerill whether the other AOMs would also be accompanied by him or Fennell when they administered the warnings to their store managers, and Cockerill responded that they would not be accompanying the other AOMs.  Kirkland never asked why the other AOMs would not be accompanied when they provided the Final Warnings

-5-

to their respective store managers.  Kirkland testified at his deposition that he assumed he was to be accompanied when administering the Final Warnings to the CWN store managers because he is black and because of the unequal treatment he had received under Belden.  Kirkland contends that he complained to Cockerill, in Fennell's presence, that he was being treated unfairly in comparison to his white counterparts because someone would be accompanying him when he delivered the Final Warnings to the CWN store managers.  Kirkland contends that neither Cockerill nor Fennell responded to his complaint.

Kirkland submitted a written complaint to Cockerill and Fennell about receiving the Final Written Warning.  He protested that it was unfair to discipline him and the other AOMs, whom Kirkland characterized as "all minorities," while Belden, their former managing director, who is a white male and was in charge of the Optimum Stores during the audit process, received a promotion.  The Final Written Warnings were subsequently rescinded and replaced with a note to the personnel file of each AOM.

In or about October 2008, Kirkland requested that Cockerill approve Kirkland's request to move his home base store from the Soundview, Bronx County, Optimum Store to the Wappingers Falls, New York, Optimum Store, the facility closest to Kirkland's home; Kirkland sought to reduce his commute time and save himself money.  Cockerill denied the request stating that he wanted Kirkland assigned to CWN's highest volume store.  Kirkland protested that none of the other AOMs, who were white, was required to work in her highest volume store.  According to Kirkland, Cockerill did not respond to his complaint.

Kirkland contends that, in November 2008, Cockerill directed him to interview a white applicant for a Team Leader position and then attempted to pressure Kirkland into hiring the individual.  Kirkland advised Cockerill that he wished to interview the remaining candidate for

the vacancy, a black male, prior to making his decision.  However, Cockerill instructed Kirkland

to contact the recruiter for the position and arrange to make a job offer to the white candidate.

Kirkland recalls that he solicited Cockerill's opinion of the black candidate and learned that

Cockerill had not interviewed him.  According to Kirkland, he protested to Cockerill that the

process was not fair and advised Cockerill that he would not make his hiring decision until he

met with all the applicants.

      In that same month, Cockerill and the four AOMs attended an Optimum Stores

management team meeting at which a representative from Home Box Office ("HBO") made a

presentation.  At the end of the presentation, the HBO representative invited the Optimum Stores

management team to lunch.  Cockerill stated that everyone except Kirkland could join the HBO

representative for lunch. When Kirkland demanded to know the reason he was being excluded,

Cockerill did not respond to him.  Kirkland requested that Cockerill ask an Employee Relations

representative to join them and Cockerill reversed his decision immediately and permitted the

plaintiff to join the others for lunch.

      Kirkland advised Cockerill that he wished to meet with an Employee Relations

representative and Cockerill after lunch to discuss what Kirkland viewed as discriminatory

treatment.  Later Kirkland met with Cockerill, Fennell and Donnelly and expressed his concern

about unfair and discriminatory treatment Cockerill had exhibited toward him.  Kirkland recalls

that he told the others at the meeting "Me and my people are being treated unfairly and not given

equal opportunities in this department and it's been going on for a long time."  Kirkland

maintains that his reference to "my people" was a reference to the defendant's black employees.

Cockerill denied the allegations.  According to Kirkland, Fennell and Donnelly left the meeting

without commenting and never investigated or followed-up on his complaint about

discrimination.

Kirkland alleges that, in November 2008, Cockerill, without consulting him, arranged with the Long Island region AOM to have one of her employees, a white male, fill in for a Connecticut store manager, who was about to commence a leave of absence under the Family and Medical Leave Act. Cockerill advised Kirkland that the employee who was being assigned to his region lived in Westchester County, and the assignment to the Connecticut store would shorten his commute and save him money on tolls. Kirkland protested to Cockerill that Cockerill was treating Kirkland unfairly (1) in comparison to white AOMs, by assigning an employee to his region without consulting with him, as is the process when making temporary personnel assignments to the Optimum Stores regions, and (2) by transferring a white employee to a store closer to his home to shorten his commuting time and save him money, when Cockerill had refused to provide the same accommodation to Kirkland, when he requested that his home base store be switched from the Soundview store to the Wappingers Falls store. Kirkland recalls that Cockerill did not respond to his complaint.

In November 2008, Kirkland requested a meeting with a representative of the defendant's Corporate Human Resources Department. He met with Sue Crickmore ("Crickmore"), the defendant's employee relations vice president. During that meeting, Kirkland complained about the discriminatory treatment he received from Cockerill and his predecessor, Belden, and discussed the concerns he had about his 2007 annual performance evaluation, none of which, he maintains, had been addressed by the defendant.

On December 3, 2008, Fennell contacted Kirkland and requested to meet with him the next day. When Kirkland arrived for the meeting, he found Cockerill and Fennell waiting for him in the Soundview Human Resources Office. Fennell advised Kirkland that his employment

with the defendant was terminated.  Kirkland recalls that he asked for the specific reasons for the termination and Fennell replied only that "the company has decided to end its employment relationship" with Kirkland.  Kirkland maintains that the defendant terminated his employment because of his race and retaliated against him for complaining of discrimination.

Kirkland filed a charge against the defendant, with the United States Equal Employment Opportunity Commission ("EEOC"), on February 13, 2009,[1] alleging discrimination based on race, color, national origin and sex and that the defendant retaliated against him.  In the charge, Kirkland noted, inter alia, that in the preceding two or three years he had complained that he was not treated equally when compared to the white AOMs, and that in August 2008, he advised Cockerill that Belden had not treated him as he had treated the other AOMs.  Kirkland alleged that he reminded Cockerill of this, in November 2008, and complained that the unequal treatment continued under Cockerill's watch.  Kirkland also recounted the November 2008 meeting with Cockerill, Donnelly and Fennell where he stated "his people" had not been treated fairly for a long time.  The EEOC issued Kirkland a dismissal letter and Notice of Right to Sue in August 2009; thereafter, he commenced this action.

For its part, the defendant contends that throughout Kirkland's tenure as an AOM, he was unable to establish a successful working relationship with the CWN store managers he supervised, exercised poor judgment, disregarded its policies and, despite receiving counseling from his managing director and the defendant's human relations and human resources personnel, failed to cure the deficiencies in his performance.  The defendant also maintains that at no time during these meetings or on any other occasion, did Kirkland complain to it of discrimination,

---

[1]Kirkland's amended complaint lists December 5, 2008, as the date he filed his EEOC charge.  The record before the Court shows that Kirkland's charge is dated February 13, 2009.

either in writing or orally.

With respect to the disparity in salaries between Kirkland and the other AOMs, Cablevision contends that the starting salary of three of the AOMs, Kirkland, Wicklund and Burgin, were set by Belden, whose standard practice "when promoting an employee whose salary falls below the salary grade for [the employee's] new position, [was] to increase that employee's salary to around the minimum of that salary grade." Thus, Wicklund's starting salary, as an AOM, was $80,627 and Burgin's starting salary, as an AOM, was $73,400. The defendant maintains that the salaries for these employees were comparable to Kirkland's starting salary. Cablevision maintains that Belden played no role in setting the starting salary Cavazzi earned as an AOM and, further, that her salary cannot be compared to Kirkland's because she had occupied a higher salary-grade position before she became an AOM.

In addition, the defendant contends that, beyond the starting salaries, the difference in salary among the AOMs occurred because those holding the title, other than Kirkland, began in their AOM positions as early as 2002 and had been eligible for year-end bonuses under Cablevision's Management Performance Incentive Plan ("MPIP"). However, prior to November 2004, when Kirkland was promoted, the MPIP was discontinued and all incumbent AOMs received a salary adjustment to account for the elimination of the performance incentive plan. Therefore, according to the defendant, the disparity in salaries that existed among the AOMs had nothing to do with race discrimination and is a function of tenure in the position and the adjustment to salaries occasioned by the cessation of the MPIP.

*Undisputed Facts*

The following facts are not disputed by the parties.[2]  Kirkland began working for

Cablevision in 1999, and received the defendant's Employee Handbook, which contains its anti-

discrimination policies and internal complaint procedures.  The handbook encourages an

employee to avail himself of Cablevision's open door policy and internal complaint process, if

the employee believes he has been discriminated against or treated improperly.  In such a

circumstance, the handbook directs the employee to contact his Employee Relations Manager or

Corporate Employee Relations who are both responsible for investigating such matters fully and

promptly.

Kirkland received several promotions while employed by Cablevision; the last occurred

in October 2004.  At that time, Belden and Naples selected Kirkland to fill the AOM position for

Cablevision's Optimum Stores located in the CWN region.  CWN is the region with the most

cash transactions and the highest cash volume of the four regions in which Optimum Stores are

located.  Upon his promotion, Kirkland reported directly to Belden, as did the other three AOMs.

Kirkland's starting salary, as an AOM, was $74,800.  His salary was less than the salary that was

paid to each of the other AOMs, all of whom were white females.

In his AOM capacity, Kirkland was responsible for overseeing the overall operations of

---

[2]Kirkland failed, inter alia, to file with his motion for summary judgment a Local Civil
Rule 56.1 statement of material facts, as to which he contends no genuine issue to be tried exists,
in the format required by the local rule.  The defendant maintains that Kirkland's failure
warrants the dismissal of his motion.  However, the Court, in its discretion, determined to
overlook this violation of the local rule.  See Phoenix Global Ventures, LLC v. Phoenix Hotel
Assocs., Ltd., 422 F.3d 72, 75 (2d Cir. 2005).  The undisputed facts recited here are derived
primarily from the Local Civil Rule 56.1 statement submitted by the defendant with its motion,
the counterstatement Kirkland submitted in response and the admissible evidence to which the
parties made citation in those documents.

all CWN Optimum Stores, managing the stores' staffs and implementing and ensuring compliance with Cablevision's policies and procedures.  Six store managers, all of whom were black, reported directly to Kirkland.  Store managers supervise the day-to-day operations of the stores and the Team Leaders and CRCs assigned to their respective stores.

In 2005 and 2006, Belden received complaints from Kirkland's store managers that he was undermining their authority with their Team Leaders and CRCs by overturning their staffing decisions without consulting them, ignoring some store managers and displaying favoritism toward certain female employees.  Kirkland bought gifts for certain female employees including a cake and a television, chauffeured some in his private automobile and paid the cable bills for others.  Donnelly received similar complaints from Kirkland's store managers and investigated rumors that Kirkland was involved in a personal relationship with a female subordinate.

Belden, Donnelly and Pat Murray ("Murray"), the defendant's director of administration, who was in charge of human relations for Cablevision's Billing & Collections Department, counseled Kirkland about using better judgment and avoiding the appearance of favoritism.  However, throughout 2007, Belden and Donnelly continued to receive store-manager complaints about Kirkland.

Kirkland received annual performance evaluations from his managing director.  Kirkland was rated on a scale from one to five, where five is the highest rating.  For 2005, Kirkland's first full year as an AOM, Belden gave Kirkland an overall performance rating of three, indicating that Kirkland had "Achieved Expected Performance."  However, Belden gave Kirkland a rating of two, "Partially Achieved Expected Performance" in two areas: (1) Communicates Effectively and (2) Manages and Develops People.  Belden commented, in the narrative portion of the 2005 annual performance evaluation, that Kirkland "needs to improve his communication skills.

[Kirkland] is very reluctant to speak up in group settings and rarely provides feedback on our conference calls."  Belden expressed the hope, in the performance evaluation, that Kirkland would "contribute more in meetings and conference calls."  With respect to managing his subordinates, Belden commented, "[Kirkland] needs to develop and implement a process to ensure that all performance appraisals are completed and submitted on time.  [Kirkland] also needs to work on a development plan for his Store Managers and improve his interpersonal relationships with them."

For 2006, Kirkland again received an overall performance rating of three.  Belden gave Kirkland a rating of two, with respect to his communications skills, and made the same observations and expressed the same hope regarding Kirkland's future contributions at meetings, and during conference calls, as he expressed in the prior year's evaluation.  Kirkland received a two rating, respecting his skills managing and developing people.  Belden commented that "[Kirkland] needs to develop and implement a process to ensure that all performance appraisals are completed and submitted on time.  In his region, 54% of the performance appraisals were submitted late and 3 were administered late.  [Kirkland] also needs to work on a development plan for his Store Managers and seriously improve interpersonal relationships with them." Belden also gave Kirkland a two rating in the category "Develops Relationships."  This was a lower rating than he had received, in this category, the previous year.  Belden explained that "[Kirkland] had displayed acts of favoritism, inconsistency, and unprofessional behavior with CRCs at times.  [Kirkland] has not been able to develop positive relationships with his entire direct report team."

In Kirkland's 2007 annual performance evaluation, Belden gave him an overall performance rating of two, indicating that Kirkland "Partially Achieved Expected Performance."

Once again, Belden gave Kirkland a two rating in the categories "Communicates Effectively" and "Develops Relationships." His comments about Kirkland's performance in these two categories mirrored the comments he made in the prior year's performance appraisal. In the category "Manages and Develops People," Kirkland also garnered a two rating. While Belden noted that Kirkland had "improved in the area of submitting performance reviews in a timely manner," he still felt that Kirkland needed to "improve his interpersonal relationships" with his Store Managers.

Belden placed Kirkland on a PIP in early 2008. Under the PIP's terms, Kirkland had 60 days to improve his performance in three areas: (1) "creating a cohesive management team . . . [by] directing and empowering your direct reports in a professional, business manner"; (2) avoiding "poor judgment when making decisions that may overrule or discredit your [Store] Managers"; and (3) avoiding "poor judgment when making judgments that could be perceived as favoritism," or be subject to additional corrective action, up to and including employment termination. Kirkland completed the PIP successfully and was removed from it effective April 30, 2008, although the memorandum memorializing the termination of the PIP was not executed by Kirkland and by Donnelly, on Belden's behalf, until June 5, 2008.

Kirkland prepared a written rebuttal to his 2007 annual performance evaluation and an addendum to that document. These writings were presented to Belden and to Donnelly. Kirkland contested each assessment where he failed to garner an "Achieved Expected Performance" rating. In neither the written rebuttal, nor the addendum, did Kirkland assert that his 2007 annual performance evaluation was the product of racial bias or discriminatory animus.

Fennell joined Cablevision in 2008, replacing Murray as director of administration, for the defendant's Billings & Collections Department. Fennell met with Kirkland shortly after he

joined Cablevision to discuss Kirkland's 2007 performance evaluation.  At that meeting,
Kirkland expressed his concerns and disagreements with the assessment Belden had made of his
2007 performance.

     In June 2008, Kirkland convened a store managers meeting in Ossining, New York.
Several store managers arrived late, and reported to the defendant that Kirkland berated them
and ridiculed them, in front of one another, about their respective performance deficiencies.  In
that same month, Kirkland recommended an employee for a temporary promotion who was on a
formal written reprimand.  Furthermore, in July 2008, Donovan Taylor ("Taylor"), one of
Kirkland's store managers, complained that Kirkland failed to submit, timely, a travel and
expense report tendered to him by Taylor resulting, initially, in the denial of the reimbursement.

     In July 2008, Donnelly prepared and forwarded to Fennell a request that Kirkland's
employment be terminated because he failed consistently to make appropriate managerial
decisions and to manage the personnel in his region effectively and efficiently.  After receiving
Donnelly's termination request, Fennell met with Kirkland on August 8, 2008.  During their
meeting, Kirkland attributed the complaints raised by his store managers to a difference in
managerial philosophies.  After the meeting with Kirkland, Fennell determined that he could not
support Donnelly's request, that Kirkland's employment with Cablevision be terminated, and no
action was taken by the defendant on Donnelly's request.

     On August 5, 2008, Cockerill replaced Belden as managing director of Cablevision's
Optimum Stores.  Kirkland had applied, and was interviewed, for the managing director position.
Shortly after being appointed managing director, Cockerill received complaints from several
CWN store managers that Kirkland was frequently unavailable and unreachable, worked against
the managers, which impacted employee operations adversely, displayed favoritism toward

certain employees and condoned breaking Cablevision's policies.

In that same month, Cockerill met with and issued a written reprimand to each of the four AOMs, based on the results of store audits that had been conducted earlier in the year.  Each AOM protested the written reprimand.  As a result, each reprimand was rescinded and replaced with a note to each AOM's personnel file.  Based on the store audit results, Cockerill required the four AOMs and the store managers who reported to them, to conduct monthly store audits.  Despite being given reminders that he and his store managers had to complete their audits fully and on time, Kirkland submitted incomplete audits for the months of October and November 2008.

Cockerill discovered that Kirkland was submitting travel and expense reimbursement requests as if Wappingers Falls, New York, was his home base, not Bronx County, and miscalculating the travel expense reimbursements owed to him, under the defendant's reimbursement policy, by failing to subtract his normal commute from the reimbursable amount.  The defendant's reimbursement policy requires an AOM to subtract his or her normal commute from the total miles driven on any day, when the AOM starts the day at a location other than the AOM's home base.  After Cockerill made his discovery, Kirkland requested that he be permitted to change his home base store to Wappingers Falls to shorten his commute, as Kirkland claimed he had moved from Bronx County to Fishkill, New York.  Kirkland later testified at his deposition that he did not "officially" move to Fishkill until after his employment with the defendant had terminated.  Cockerill denied the request explaining to Kirkland that he needed to be stationed in the highest volume location in CWN, the Soundview Optimum Store.

In October 2008, new reports surfaced from Kirkland's store managers that he was unable to be reached when they needed him and failed to keep scheduled appointments.  On one

occasion, a store manager arranged for Kirkland to interview a job applicant at 10:00 a.m.

Kirkland did not arrive for the interview until 3:00 p.m.  During the five hours the applicant

waited, Kirkland did not contact the store manager to advise that he would be late for the

meeting or to direct that the interview be rescheduled.  On October 13, 2008, Cockerill was

unable to contact Kirkland via telephone for several hours.  When he did reach Kirkland, and

asked about his lack of accessibility via telephone, Kirkland informed Cockerill that he was

having problems with his Cablevision-issued mobile telephone.  Kirkland had never before

mentioned that he was experiencing difficulties with his mobile telephone service.  On October

17, 2008, Kirkland took four hours to travel to the defendant's Litchfield, Connecticut, store

from Brooklyn, New York, to handle an incident involving an employee who appeared to be

under the influence of alcohol.  During those four hours, the defendant's personnel could not

reach Kirkland to confirm he was en route to the store or to give him guidance.

       On October 14, 2008, Cockerill prepared a termination-request memorandum regarding

Kirkland.  Cockerill's memorandum was forwarded to Fennell, who approved it on October 16,

2008.  In November 2008, Kirkland sent a memorandum dated June 10, 2008, to Crickmore.  In

the memorandum Kirkland protests his 2007 annual performance evaluation and his placement

on the PIP.  Kirkland did not mention discrimination or retaliation in the memorandum.  In

November 2008, the defendant's Human Resources Department and its legal counsel approved

Cockerill's request that Kirkland's employment be terminated.  Naples, who along with Belden,

had selected Kirkland for his AOM position, approved Cockerill's termination request on

December 2, 2008.  On December 4, 2008, Cockerill and Fennell met with Kirkland in the

Soundview Optimum Store.  Fennell advised Kirkland that his employment with Cablevision

was terminated.

In January 2009, Kirkland wrote a letter addressed to the defendant's chairman, chief executive officer and chief operating officer seeking reconsideration of the termination of his employment.  Kirkland never mentioned discrimination or retaliation in that letter.

On February 25, 2009, Kirkland filed a charge of discrimination with the EEOC alleging the defendant discriminated against him because of his race, color, national origin, and sex, and retaliated against him.  On August 31, 2009, the EEOC dismissed the plaintiff's charge.  The EEOC indicated that Kirkland had "provided no evidence in support of [his] assertions" of discrimination and that he was "not unlawfully retaliated against," since he "did not participate in the protected activity of complaining about gender and racial discrimination to [his] former employer."

Kirkland was succeeded, as CWN's AOM by Kathryn Nivins ("Nivins"), an Asian woman, who lacked the minimum managerial experience required by the defendant for its AOMs.

## DISCUSSION

*Summary Judgment Standard*

Summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' if it 'might affect the outcome of the suit under the governing law. . . .'"  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury can return a verdict for the nonmoving party."  Id.  A motion for summary judgment requests that a district court perform the "threshold" inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that

properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." 477 U.S. at 250, 106 S. Ct. at 2511.

The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the record," including, inter alia, depositions, documents and affidavits or declarations, that "it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986); see also Fed. R. Civ. P. 56(1). Once the moving party has met its burden, the non-moving party must "go beyond the pleadings" and provide its own evidence or make citation to portions of the existing record that show a genuine triable issue exists. See Celotex, 477 U.S. at 324, 106 S. Ct. at 2533. To defeat a motion for summary judgment, the non-moving party must come forward with more than "a scintilla of evidence[.]" Anderson, 477 U.S. at 252, 106 S. Ct. at 2512.

In evaluating a motion for summary judgment, a district court's "function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249, 106 S. Ct. at 2511. Hence, a district court should not make credibility determinations in ruling on a motion for summary judgment. See id. at 255, 106 S. Ct. at 2513. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id.

*The Defendant's Rule 56 Motion*

*Statute of Limitations*

A plaintiff wishing to hold an employer defendant liable for multiple incidents of discrete acts of discrimination, including termination of employment, failure to promote, denial of transfer, or failure to hire under the New York State Human Rights Law, must file his claim of

discrimination within three (3) years of the alleged discriminatory act.  See New York Civil Practice Law and Rules § 214(2); see also Lightfoot v. Union Carbide Corp., 110 F.3d 898, 907 (2d Cir. 1997).  The same is true if the action is brought under the New York City Human Rights Law.  See New York City Administrative Code § 8-502(d).  In a state or locality with a fair employment agency, a charge of discrimination, made pursuant to Title VII, must be filed with the EEOC within 300 days of the alleged discrimination or within 30 days of notice of termination of the state's or the locality's proceeding, whichever comes first.  See Ford v. Bernard Fineson Dev. Ctr., 81 F.3d 304, 307 (2d Cir. 1996); 42 U.S.C. § 2000e-5(e)(1).  However, under the continuing violation doctrine, if a plaintiff files a charge of discrimination that is timely as to any incident of discrimination, in furtherance of an employer's ongoing policy of discrimination, all claims respecting acts of discrimination under that policy are timely, even if they would be untimely standing alone.  See Patterson v. County of Oneida New York, 375 F.3d 206, 220 (2d Cir. 2004); Russell Sage College v. State Div. of Human Rights, 45 A.D.2d 153, 155, 357 N.Y.S.2d 171, 172 (App. Div. 3rd Dep't 1974).

The defendant contends that allegations made by Kirkland in his amended complaint that pertain to events occurring before 2006 are time-barred under the state and municipal anti-discrimination laws.  It also contends that, because Kirkland did not file his charge with the EEOC until February 2009, "nothing predating May 2008 is actionable under Title VII."[3]  The conduct Kirkland complains of, for the most part, represents discrete acts of discrimination, for example, the denial of his request to change his home base store, the issuance of an unsatisfactory performance evaluation, and the termination of his employment.  He has not

---

[3]The Court calculates that 300 days prior to February 13, 2009, is April 19, 2008.

adduced evidence establishing that these incidents are the result of a discriminatory policy employed by the defendant.  Therefore, except for Kirkland's claim that he was subjected to a hostile work environment, as explained below, events occurring prior to 2006 are not actionable under the state and municipal human rights laws and those occurring prior to April 19, 2008 are time-barred under Title VII.  "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"  So long as a single 'act contributing to the [hostile work environment] claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'"  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117, 122 S. Ct. 2061, 2074 (2002).  Here, Kirkland makes citation to several events occurring after April 2008 to support his claim that he was subjected to a hostile work environment while employed by Cablevision.  Having done so, all acts Kirkland contends contributed to the hostile work environment may be considered by the court in determining Cablevision's liability on that claim.  Therefore, the defendant may not invoke the statute of limitations to bar Kirkland from relief on his hostile work environment claim.

*Race-based Termination*[4]

Under Title VII, it is unlawful for an employer to discharge an employee based on his

---

[4]"The standards for recovery under the New York State Human Rights Law . . . are the same as the federal standards under Title VII"; therefore, no independent analysis of Kirkland's New York State Human Rights Law claims is necessary.  Nelson v. HSBC USA, 41 A.D.3d 445, 446, 837 N.Y.S. 2d 712, 713 (App. Div. 2d Dep't 2007).  That is not the case with respect to the New York City Human Rights Law.  The standard for recovery under that law does not mirror the standard applicable to Title VII claims.  Accordingly, New York City Human Rights Law claims must be analyzed independently of Title VII claims.  See e.g. Williams v. New York City Hous. Auth., 61 A.D.3d 62, 76, 872 N.Y.S.2d 27, 38 (App. Div. 1st Dep't 2009) (describing the different standards to be applied when analyzing hostile work environment claims under the New York City Human Rights Law).

race.  See Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008).  Under the burden-

shifting analysis described by the Supreme Court in McDonnell Douglas Corp. v. Green,

411 U.S. 792, 93 S. Ct. 1817 (1973), to prevail on a Title VII discriminatory discharge claim, a

plaintiff must first establish a prima facie case of discrimination.  See McDonnell Douglas,

411 U.S. at 802, 93 S. Ct. at 1824.  If the plaintiff succeeds in establishing the prima case, the

burden shifts to the defendant employer to articulate some legitimate non-discriminatory reason

for the employee's termination.  See id.  Should the defendant satisfy this burden, the plaintiff

must then prove, by a preponderance of the evidence, that the reason offered by the defendant

was not its true reason but was merely a pretext for discrimination.  See Patterson, 375 F.3d at

221.

       To establish a prima facie case of race-based discriminatory discharge, a plaintiff must

show: (1) he is a member of a protected group; (2) he was qualified for the position; (3) he was

discharged; and (4) his discharge occurred under circumstances giving rise to an inference of

racial discrimination.  See Hargett v. National Westminster Bank, USA, 78 F.3d 836, 838 (2d

Cir. 1996).

       It is uncontested that, as a black male, Kirkland is a member of a protected group,

thereby satisfying the first prong of the prima facie case.  With respect to the second prong,

whether the plaintiff is qualified to perform the job in question, the Second Circuit Court of

Appeals has described the qualification prong of the prima facie case as a question of

"competence to perform the specified work."  Powell v. Syracuse University, 580 F.2d 1150,

1155 (2d Cir. 1978).  Nothing in the record demonstrates that Kirkland was not competent to

perform the work of an AOM, as he received an overall performance rating of "Achieved

Expected Performance" in two annual performance evaluation periods, 2005 and 2006.

Furthermore, after receiving an overall rating of "Partially Achieved Expected Performance" for 2007, Kirkland completed the PIP successfully, on which he was placed by Belden. This too demonstrates his competence to perform the work of an AOM. Therefore, the Court finds that Kirkland has also satisfied this prong of his prima facie case. With respect to the third prong, since Kirkland's employment by Cablevision was terminated, this prong has been satisfied.

Having satisfied three of the four prongs, Kirkland still bears the burden of demonstrating that his termination occurred under circumstances that give rise to an inference of racial discrimination. The inference of discrimination may be drawn from circumstances including, but not limited to, an employer's replacing the plaintiff with someone outside the plaintiff's protected group. See Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001). In the case at bar, Cablevision appointed Nevins to succeed Kirkland as AOM for the defendant's CWN region. The record establishes that Nevins is not a member of Kirkland's protected group and, further, that she did not possess the minimum years of managerial experience required by the defendant of its AOMs. Since the defendant replaced Kirkland with someone outside his protected group, Kirkland has satisfied the fourth prong of his prima facie case.

The defendant proffers, as its reasons for terminating Kirkland's employment, that he failed, over time, to establish a working relationship with the store managers he supervised, failed to improve his performance, after being counseled by his supervisors and the defendant's employee relations and human resources personnel, and did not follow the defendant's policies. Cablevision's dissatisfaction with Kirkland's job performance is a non-discriminatory legitimate reason for its action. See Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 93 (2d Cir. 2001). It thus falls to the plaintiff to prove that the reasons offered by Cablevision for his

termination are pretext for racial discrimination.  See Patterson, 357 F.3d at 221.  Kirkland has

not presented evidence that shows that: (a) his store managers and he had a good working

relationship and that the store managers did not complain to Cockerill about his performance as

an AOM, in 2008, after Kirkland had completed the PIP; and (b) he always complied with the

defendant's policies.  Furthermore, Kirkland has not presented evidence showing that similarly

situated white employees, whose store managers complained about their performance as AOMs,

or who failed to comply with the defendant's policies were treated more favorably than he,

which would support a finding that Cablevision's proffered reasons for his termination are

pretext for racial discrimination.  See Hargett, 78 F.3d at 839.  As a consequence, the Court finds

that Kirkland has not met his burden of proving, by a preponderance of the evidence, that the

non-discriminatory reasons proffered by his former employer for his termination are pretext and

that his race played a part in the decision to discharge him.  Therefore, the defendant is entitled

to summary judgment on Kirkland's race-based termination claim.

*Retaliatory Discharge*

   Title VII makes it unlawful for an employer to discriminate against an employee because

the employee has opposed any practice that has been made an unlawful employment practice by

Title VII.  See 42 U.S.C. § 2000e-3(a).  A retaliatory termination claim asserted under Title VII

is subject to the McDonnell Douglas, burden-shifting analysis.  See Gorzynski v. JetBlue

Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010). Therefore, a plaintiff making such claim must

establish a prima facie case of retaliation.  To do so, the plaintiff must present sufficient

evidence to show that: (1) he participated in a protected activity; (2) the defendant knew of the

protected activity; (3) he experienced an adverse employment action; and (4) a causal connection

exists between the protected activity and the adverse employment action.  See id. "The term

protected activity refers to action taken to protest or oppose statutorily prohibited discrimination." Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000) (internal quotation marks omitted).

Through affidavits and during his deposition testimony, Kirkland maintained that on several occasions he complained of discrimination to his immediate supervisor and to members of the defendant's Human Resources Department and its Employee Relations Manager orally and in writing, by referencing the anti-discrimination "values" discussed in the defendant's Employee Handbook. However, the defendant has presented affidavits from the persons to whom Kirkland alleges he made his complaints, in which each denies that Kirkland made any complaints of discrimination. In evaluating a motion for summary judgment, a court "is not entitled to weigh the evidence," St. Pierre v. Dyer, 208 F.3d 394, 404 (2d Cir. 2000), and is not permitted to make credibility determinations. See Anderson, 477 U.S. at 255, 106 S. Ct. at 2513. Weighing the evidence and making credibility determinations is, in our system of justice, the task of a jury. See Ninely v. City of New York, 414 F.3d 381, 390 (2d Cir. 2005). Whether Kirkland complained of discrimination to the defendant and thus engaged in protected activity is a credibility question for the jury. Therefore, the defendant is not entitled to summary judgment on Kirkland's retaliatory discharge claim.

*Hostile Work Environment*

A hostile work environment claim made under Title VII requires a plaintiff to demonstrate that the objectionable conduct to which he was subjected was so severe or pervasive that it altered the conditions of his employment and that a specific basis exists for imputing the hostile conduct to his employer. See Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002). As a general rule, "incidents [of hostile conduct] must be more than 'episodic; they must be

sufficiently continuous and concerted in order to be deemed pervasive.'  Isolated acts, unless

very serious, do not meet the threshold of severity or pervasiveness."  Id. at 374 (citations

omitted).  A plaintiff asserting a hostile work environment claim, under Title VII, must also

establish that his workplace was permeated with discriminatory intimidation, ridicule and insult

that was sufficiently severe or pervasive that it altered the conditions of his employment and

created an abusive working environment.  See McGullam v. Cedar Graphics, Inc., 609 F.3d 70,

79 (2d Cir. 2010).

The standard a plaintiff must meet to prevail on a hostile work environment claim, under

Title VII, has objective and subjective elements: "the misconduct shown must be severe or

pervasive enough to create an objectively hostile or abusive work environment and the [plaintiff]

must also subjectively perceive that environment to be abusive."  Alfano, 294 F.3d at 374

(quotation marks and citation omitted).  In addition, to establish a race-based hostile work

environment claim, a plaintiff must establish that the hostile conduct occurred because of his

race.  See id.

Kirkland relies on several events to demonstrate that he was subjected to a hostile work

environment: (1) an admonition he attributes to Donnelly that Kirkland should "[b]e careful of

what you write, remember you have to work with these people," which, according to Kirkland,

was delivered to him prior to his November 2008 submission to Crickmore of a written

complaint, dated June 10, 2008, concerning his 2007 annual performance evaluation, and

Donnelly's comment to Kirkland, when he reminded her that the defendant valued and

encouraged its employees to express themselves freely without fear of reprisal, "Come on Gary,

how long have you been working here?"; (2) a white AOM's assertion, in a written rebuttal to a

formal written reprimand she received after audits were conducted at the stores she managed,

that, "I do fear reprisal"; (3) the deposition testimony of Nevins that, during a conversation with Cockerill after Kirkland's dismissal, Cockerill told Nevins that Kirkland had failed to "write up" Dee Davenport, one of the CWN store managers and that Cockerill stated "they don't know how to police each other" and that "CWN could lighten up a bit."  Nevins also recounted a conversation with Fennell in which he claimed that Cockerill "is known as KKK without the hood"; and (4) Kirkland's allegation that Naples sought "to cover-up and destroy evidence of discrimination."

Viewing the events in the light most favorable to Kirkland, the party opposing summary judgment, the objectionable conduct upon which he is relying to establish his hostile work environment claim is a collection of unrelated events and, except for the reference to KKK, the events are all race-neutral.  Kirkland maintains that Cockerill's statements to Nevins were race-based.  However, Nevins testified at her deposition that she did not understand what Cockerill meant by the statements referenced above and she did not ask him to explain them.  Therefore, Kirkland's claim that the statements were race-based is nothing more than speculation.  In addition, the statements allegedly made by Fennell and Cockerill to Nevins are hearsay and were allegedly uttered after Kirkland was no longer employed by Cablevision; consequently, these events could not have altered the conditions of Kirkland's employment.  Unrelated isolated events, that cannot reasonably and objectively be seen as continuous and concerted incidents of hostile conduct directed at an employee because of his race, do not establish a race-based hostile work environment claim under Title VII.  See Alfano, 294 F.3d at 374.

Based on Kirkland's failure to meet his burden of establishing that objectionable race-based conduct of a severe and pervasive nature was directed at him, while he was employed by Cablevision, or that his workplace was permeated with discriminatory intimidation, ridicule and

insult so severe or pervasive that it altered the conditions of his employment and created an abusive working environment for him, Cablevision is entitled to summary judgment on Kirkland's Title VII hostile work environment claim.

*Disparate Treatment*

Kirkland contends that he was treated differently from the other AOMs, all of whom were white, with respect to the: (1) criteria under which his performance was evaluated in 2007; (2) designation of his home base store; and (3) salary he received.  To establish his claim of disparate treatment under Title VII, Kirkland must show that Cablevision intentionally treated him less favorably than it treated similarly situated non-minority employees and that it did so because of his race.  See Demoret v. Zegarelli, 451 F.3d 140, 151 (2d Cir. 2006).

Claims of disparate treatment are analyzed under the McDonnell Douglas burden-shifting framework.  See id.  As noted above, under that framework, a plaintiff has the initial burden of establishing a prima facie case by demonstrating that: (1) he is a member of a protected class; (2) his job performance was satisfactory; (3) he suffered an adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination.  If the plaintiff satisfies his burden by demonstrating a prima facie case, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the action it took against the plaintiff.  Upon making such a showing, the burden shifts back to the plaintiff to prove discrimination by showing that the reason proffered by the defendant employer is pretextual.  See id.

Kirkland's status, as a member of a protected group, is uncontested.  Therefore, the first prong of the prima facie case has been satisfied.  To satisfy the second prong, satisfactory performance, requires only a showing that "the plaintiff meets the "basic eligibility [requirements] for the position at issue, and not the greater showing that he satisfies the

-28-

employer." Slattery, 248 F.3d at 92.  As there is no claim that Kirkland did not meet Cablevision's basic eligibility requirements for the position AOM, the second prong of Kirkland's prima facie case has also been satisfied.  An adverse employment action, as contemplated by the third prong of the prima facie case, is an action that results in a "materially adverse change in the terms and conditions of employment. . . . [S]uch a change include[s] termination of employment."  Sanders v. New York City Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004) (internal quotation marks and citations omitted).  In addition, paying a black employee considerably less than whites who hold the same position may also be an adverse employment action.  See Demoret, 451 F.3d at 151.  The defendant concedes that Kirkland was paid less than the white AOMs who were his colleagues.  Under these circumstances, Kirkland has satisfied the third prong of his prima facie case, as it relates to his salary disparity claim.  See Belfi v. Prendergast, 191 F.3d 129, 140 (2d Cir. 1999).

The fourth prong, requires Kirkland to show that the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  A showing that an employer treated a plaintiff less favorably than a similarly situated employee outside the plaintiff's protected group is an established method of raising an inference of discrimination for the purpose of establishing a prima facie case.  See Mandel v. County of Suffolk, 362 F.3d 368, 379 (2d Cir. 2003).  Kirkland has made that showing with respect to the salary disparity that existed between him and the white AOMs.  However, he has not presented evidence establishing the criteria under which the other AOMs were evaluated or the criteria the defendant employed for designating home base stores.  This evidence is needed to assess whether, in the circumstance of this case, an inference of discrimination may be drawn either from an inconsistent application of the criteria among white and black AOMs or a failure to employ the criteria at all with respect

-29-

to the white AOMs.  Therefore, the Court finds that the fourth prong of the prima facie case has been satisfied, as it relates to the salary disparity claim only, and the defendant must present a legitimate non-discriminatory reason for the disparity in pay that existed between Kirkland and the other AOMs.

According to the defendant, the disparity in starting salaries between Kirkland, Wicklund and Burgin, resulted from Belden's standard practice "when promoting an employee whose salary falls below the salary grade for [the employee's] new position."  Cablevision contends that Belden would "increase that employee's salary to around the minimum of that salary grade." Thus, Wicklund's starting salary, as an AOM, was $80,627 and Burgin's starting salary, as an AOM, was $73,400.  The defendant maintains that the starting salaries for these employees were comparable to Kirkland's starting salary of $74,800.  Cablevision maintains that Belden played no role in setting the starting salary Cavazzi earned as an AOM and, furthermore, because she occupied a higher salary-grade position before becoming an AOM, she is not an appropriate comparator with Kirkland when assessing AOM starting salaries.

The defendant also contends that looking beyond the starting salaries, the difference in salary among the AOMs occurred because those holding the title, other than Kirkland, began in their AOM positions as early as 2002 and had been eligible for year-end bonuses as part of Cablevision's MPIP.  However, prior to November 2004, when Kirkland was promoted to AOM, the MPIP was discontinued, and all incumbent AOMs received a salary adjustment to account for the elimination of the performance incentive plan.  Therefore, according to the defendant, the disparity in salaries that existed among the AOMs had nothing to do with race discrimination and is a function of tenure in the position and the adjustment to salaries occasioned by the cessation of the MPIP.

The reasons offered by the defendant for the salary disparities are non-discriminatory business management reasons.  Therefore, in order to survive the defendant's summary judgment motion, with respect to his disparate treatment claim, as it relates to the salary he received, Kirkland must present evidence that would allow a reasonable jury to infer that it was more likely than not that he was paid less than white AOMs because of an illegal race-based discriminatory motive.  See McDonnell Douglas, 411 U.S. at 804, 93 S. Ct. at 1825.  This Kirkland has not done.

Accordingly, in the absence of such evidence and in light of Kirkland's failure to establish a prima facie case of disparate treatment with respect to his 2007 annual performance evaluation or the designation of his home base store, Cablevision is entitled to summary judgment on Kirkland's Title VII disparate treatment claim.

*The Plaintiff's Rule 56 Motion*[5]

The Court has interpreted Kirkland's Rule 56 motion liberally and understands it to be a request by Kirkland for summary judgment on his race-based termination, retaliatory termination, hostile work environment and unequal terms and conditions of employment claims.

For the reasons explained above, in the analysis of Cablevision's summary judgment motion, the evidence relied upon by Kirkland does not establish his entitlement to summary judgment on the race-based termination, retaliatory discharge, hostile work environment or

---

[5]Kirkland's amended complaint contains numerous allegations of discrimination and retaliation.  The first page of the amended complaint makes clear that Kirkland is relying upon Title VII in bringing this action.  However, in his prayer for relief, Kirkland makes reference only to the state and municipal anti-discrimination laws noted above.  Inasmuch as the plaintiff is proceeding pro se, the Court has interpreted his pleadings liberally, see Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994), and understands the plaintiff to be asserting claims under Title VII, as well as the state and municipal anti-discrimination laws.

disparate treatment claims he has asserted under Title VII and the New York State Human Rights Law.

*Municipal Anti-discrimination Law*

As noted above, claims made under the New York City Human Rights Law are not subject to the same standards for recovery that apply to Title VII and New York State Human Rights Law claims.  In its most pertinent part, the New York City Human Rights Law provides that:

> [t]he provisions of this title shall be construed liberally for the accomplishment of the unique, broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those with provisions comparably-worded to provisions in this [law], have been so construed.

New York City Administrative Code § 8-130.

The New York City Human Rights Law is to be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."  Albunio v. City of New York, 16 N.Y.3d 472, 477-478, 922 N.Y.S.2d 244, 246 (2011).  Notwithstanding the broad construction that must be employed when analyzing claims made under the New York City Human Rights Law, such claims are still subject to the burden-shifting analysis to which Title VII and New York State Human Rights Law claims are subjected.  See Speigel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010).

Neither party has identified the different standard under which the plaintiff's New York City Human Rights Law claims must be analyzed, nor has either party made legal arguments in support of or in opposition to summary judgment, based on the standard for recovery applicable to the New York City Human Rights Law.  As a result, no basis exists for granting summary judgment to either party with respect to Kirkland's New York City Human Rights Law claims.

-32-

## IV.  RECOMMENDATION

For the reasons set forth above, I recommend that the defendant's motion for summary judgment, Docket Entry No. 52, be granted, in part, by dismissing the plaintiff's time-barred claims as well as his Title VII and New York State Human Rights Law claims of race-based termination, hostile work environment and unequal treatment.  I recommend, further, that the defendant's motion be denied, as it pertains to the plaintiff's retaliatory discharge claim and all the claims he has asserted under the New York City Human Rights Law.  In addition, I recommend that the plaintiff's motion for summary judgment, Docket Entry No. 33, be denied in all respects.

## V.  FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Richard J. Holwell, 500 Pearl Street, Room 1950, New York, New York, 10007, and to the chambers of the undersigned, 40 Foley Square, Room 540, New York, New York, 10007.  Any requests for an extension of time for filing objections must be directed to Judge Holwell. *Failure to file objections within fourteen (14) days will result in a waiver of objections and will preclude appellate review.*  See Thomas v. Arn, 474 U.S. 140 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d

Cir. 1992); <u>Wesolek v. Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir. 1988); <u>McCarthy v. Manson,</u>

714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:  New York, New York          Respectfully submitted,
       October 14, 2011

                                      KEVIN NATHANIEL FOX
                                      UNITED STATES MAGISTRATE JUDGE

Copies mailed to:

Garry Kirkland
Joseph Alan Nuccio, Esq.